STUART, Justice.
Michelin North America, Inc. (“Michelin”), petitions.this Court for writs of mandamus directing the Mobile Circuit Court (1) to vacate its order allowing the plaintiff Betty C. Brown (“Brown”) to conduct an on-site inspection of Michelin’s Ardmore, Oklahoma, tire-manufacturing facility (case no. 1121330), and (2) to vacate its order compelling Michelin to answer certain interrogatories and to comply with certain document requests propounded by Brown (case no. 1121341). We grant the petition in case no. 1121330 and grant the petition in part in case no. 1121341.
I.
On May 25, 2010, Brown and her husband, George A. Brown (“George”), were traveling west on Interstate 10 in Mobile when the tire mounted on the rear passenger side of their 1992 Ford Explorer sport-utility vehicle (“the subject tire”) failed, causing an automobile accident in which George was killed and Brown was injured. The subject tire was a P265/70R15 110S B.F. Goodrich Radial Long Trail T/A passenger tire, manufactured in 2004 at an Ardmore, Oklahoma, facility operated by Michelin, which owns the B.F. Goodrich brand. On November 11, 2011, Brown sued Michelin and others, in her individual capacity and as personal representative of George’s estate, alleging that her injuries and George’s death were the result of tread separation in the subject tire; her complaint specifically asserted products-li *168 ability, negligence, wantonness, breach-of-warranties, and misrepresentation claims. Concurrent with the filing of her complaint, Brown made an initial discovery request containing 22 interrogatories and 56 requests for production.
Michelin thereafter objected to the scope of Brown’s discovery request, arguing that she sought information that was both confidential and irrelevant, inasmuch as she sought information related to tires other than just B.F. Goodrich Radial Long Trail T/A passenger tires manufactured at the Ardmore facility with the same specifications as the subject tire. Eventually, Michelin and Brown agreed to a protective order governing the handling of documents and information deemed by Michelin to be confidential, and Michelin did thereafter produce some of the requested discovery. Michelin was ultimately unwilling, however, to produce all the discovery Brown requested, and, on March 17, 2013, Brown moved the trial court to compel Michelin to “fully and completely respond” to 10 outstanding interrogatories and 22 outstanding requests for production. On April 5, 2013, Michelin filed its response, arguing that Brown’s request was overbroad and that some of the requested information was protected trade secrets. Michelin supported its response with an affidavit sworn by Douglas J. Slagh, a senior technical advisor for Michelin.
Also on April 5, 2013, Brown moved the trial court to enter an order requiring Michelin to allow Brown to inspect Michelin’s Ardmore facility and to take photographs of and to videotape the manufacturing processes used by Michelin at that facility. On April 23, 2013, Michelin filed its response to Brown’s motion to inspect, arguing that she sought discovery of trade secrets protected under Alabama law and that the information sought was neither necessary nor relevant to her claims against Michelin. Michelin also moved for a protective order barring Brown from entering its Ardmore facility. Both parties thereafter filed additional briefs on the issue of the plant inspection.
On July 10, 2013, the trial court conducted a hearing at which it. heard arguments regarding both Brown’s motion to compel and her motion to inspect, and, on August 5, 2013, the trial court entered separate orders granting both motions.[1] With regard to Brown’s motion to compel, the trial court defined the scope of discoverable evidence Michelin was required to produce as follows:
“For purposes of these below-listed interrogatory answers and responses to requests for production, and for all future discovery responses, the scope of relevant discoverable evidence shall include all passenger or light truck radial tires manufactured by Michelin or any of its subsidiaries with wheel diameters between 14 and 17 inches, tire widths between 185 and 275 millimeters, aspect ratios of 50 to 80, speed rating of 130 miles per hour or below, regardless of plant of manufacture (i.e., whether Ard-more, Oklahoma; Dothan, Alabama; Woodborn, Indiana; Tuscaloosa, Alabama; Opelika, Alabama; or otherwise) for the period of time from January 1, 2000, through and including December 31, 2010.”
Using that guideline, Michelin was ordered to produce complete responses to the 10 outstanding interrogatories and 22 outstanding requests for production by August 19, 2013.
*169 With regard to Brown’s motion to inspect, the trial court entered a separate order holding that “[Brown’s] need for the on-site plant inspection and limited videotaping and photography of Michelin’s tire manufacturing, machinery, and processes outweigh any real risk of potential harm to Michelin from disclosure of such alleged trade secrets....” In accordance with that holding, the trial court defined the scope of the inspection that would be allowed to provide Michelin some protections and ordered Michelin to allow the inspection no later than September 1, 2013. On August 7, 2013, Michelin moved the trial court to stay its order granting Brown’s motion to inspect so it could seek appellate review of the order. Michelin simultaneously moved the trial court to reconsider its order or to certify the order for an interlocutory appeal pursuant to Rule 5, Ala. R.App. P. On August 8, 2013, the trial court denied those motions, and, on August 16, 2013, Michelin petitioned this Court for a writ of mandamus directing the trial court to vacate its order granting Brown’s motion to inspect and to instead grant Michelin’s motion for a protective order barring such an inspection. That petition was docketed as case no. 1121330.
Meanwhile, on August 14, 2013, Michelin moved the trial court to stay its order granting Brown’s motion to compel so it could seek appellate review of that order as well. In conjunction with that motion to stay, Michelin also moved the trial court to reconsider its order granting Brown’s motion to compel and to enter a protective order in favor of Michelin with regard to 3 of the outstanding interrogatories and 12 of the outstanding document requests. As grounds for its motion, Michelin argued that the order to compel would require it “to produce irrelevant, trade secret documentation while imposing undue burdens and excessive costs” upon it. Michelin supported its motion with another affidavit from Slagh, his third filed in this case.
On August 15, 2013, Brown filed a response opposing the August 14 motions filed by Michelin and asking the trial court to strike the affidavit filed by Slagh in conjunction with those motions. On Friday, August 16, 2013, Michelin filed an emergency motion with this Court to stay proceedings in the trial court on the basis that the trial court had not yet ruled on its August 14 motions and the ordered discovery was due on Monday, August 19, 2013. Later that day, however, the trial court denied Michelin’s August 14 motions and granted Brown’s motion to strike Slagh’s affidavit. On August 19, 2013, Michelin petitioned this Court for a writ of mandamus directing the trial court to vacate its August 5, 2013, order granting Brown’s motion to compel with respect to 3 identified interrogatories and 12 identified document requests. That petition was docketed as case no. 1121341.
After conducting an initial review of Michelin’s petition in case no. 1121341, this Court, on August 20, 2013, entered an order staying all proceedings in the trial court and ordering Brown to file a response. On September 4, 2013, we likewise ordered Brown to file a response in case no. 1121330. Brown thereafter filed a response in each case and separately moved to strike both Michelin’s petition for the writ of mandamus in case no. 1121341 as well as Slagh’s affidavit upon which that petition relied. Responses and replies to the various filings were thereafter filed by the parties, and, for convenience, we have now consolidated Michelin’s two petitions for the purpose of issuing one opinion.[2]
*170 II.
In both case no. 1121330 and case no. 1121341, Michelin seeks mandamus review of orders entered by the trial court deciding discovery matters. This Court has stated:
“ ‘ “Discovery matters are within the trial court’s sound discretion, and this Court will not reverse a trial court’s ruling on a discovery issue unless the trial court has clearly exceeded its discretion. Home Ins. Co. v. Rice, 585 So.2d 859, 862 (Ala.1991). Accordingly, mandamus will issue to reverse a trial court’s ruling on a discovery issue only (1) where there is a showing that the trial court clearly exceeded its discretion, and (2) where the aggrieved party does not have an adequate remedy by ordinary appeal.- The petitioner has an affirmative burden to prove the existence of each of these conditions.”
“ ‘Ex parte Ocwen Fed. Bank, FSB, 872 So.2d 810, 813 (Ala.2003). “ ‘Moreover, this Court will review
by mandamus only those discovery matters involving (a) the disregard of a privilege, (b) the ordered production of ‘patently irrelevant or duplicative documents,’ (c) orders effectively eviscerating ‘a party’s entire action or defense,’ and (d) orders denying a party the opportunity to make a record sufficient for appellate review of the discovery issue. 872 So.2d at 813-14. The order challenged in this case involving alleged work product and the attorney-client privilege is reviewable under category (a).’
“Ex parte Meadowbrook Ins. Group, Inc., 987 So.2d 540, 547 (Ala.2007).”
Ex parte Mobile Serv. Gas Corp., 123 So.3d 499, 504 (Ala.2013). Accordingly, we review the trial court’s rulings to see if the trial court exceeded its discretion.
III.
We first consider Michelin’s petition in case no. 1121330 challenging the trial court’s order giving Brown the right to inspect Michelin’s Ardmore facility. Michelin argues that the trial court exceeded its discretion in granting Brown’s motion to inspect inasmuch as its order doing so failed to recognize Michelin’s right to protect its trade secrets and compelled the disclosure of irrelevant information. For the reasons that follow, we agree.
This Court has recognized that “[t]he Alabama Rules of Evidence provide that trade secrets are, in some cases, privileged and not admissible at trial.” Ex parte Miltope Corp., 823 So.2d 640, 644 (Ala.2001). Specifically, Rule 507, Ala. R. Evid., provides:
“A person has a privilege, which may be claimed by the person or the person’s agent or employee, to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend , to conceal fraud or otherwise work injustice. If disclosure is directed, the court shall take such protective measures as the interest of the holder of the privilege and of the parties and the interests of justice require.”
A party asserting the trade-secret privilege has the initial burden of showing that the information sought to be shielded from disclosure constitutes a trade secret the disclosure of which would result in injury. Ex parte Miltope, 823 So.2d at 644. If such a showing is made, the burden then *171 shifts to the party seeking the disclosure of the trade secret to show that the information “is both necessary and relevant to the litigation.” II Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 361.02(5) (6th ed.2009). The trial court then “conducts a balancing process under which it decides whether the need for the information outweighs any harm that would result from its disclosure.” Id., at § 361.02(3). See also In re Remington Arms Co., 952 F.2d 1029, 1032 (8th Cir.1991) (“If the party seeking discovery shows both relevance and need, the court must weigh the injury that disclosure might cause to the property against the moving party’s need for the information. Coca-Cola Bottling Co. [v. Coca-Cola Co.], 107 F.R.D. [288,] 293 [ (D.Del.1985) ]. If the party seeking discovery fails to show both the relevance of the requested information and the need for the material in developing its case, there is no reason for the discovery request to be granted, and the trade secrets are not to be revealed.”).
In this case, the trial court, in its order granting Brown’s motion to inspect, avoided directly deciding whether Michelin had established that the manufacturing processes, techniques, and equipment used at its Ardmore facility constituted trade secrets, stating:
“Assuming [but] not deciding that some or even most of the equipment, machinery, and manufacturing processes constitute trade secrets under Alabama law, the court nevertheless finds that [Brown] has met her burden of establishing substantial need for an on-site inspection at Ardmore, and that an injustice would occur were she not permitted, subject to the restrictions imposed herein, to videotape and take photographs of the equipment, machinery, and manufacturing processes for use strictly in the presentation of her case at trial.”
However, although the trial court did not decide this issue, we note that the evidence in the record, specifically the affidavit of Jack Glazener, a Michelin employee who has worked at the Ardmore facility continuously since 1971, indicates that the manufacturing processes, techniques, and equipment Michelin uses at its Ardmore facility do in fact constitute trade secrets as that term is defined in the Alabama Trade Secrets Act, § 8-27-1 et seq., Ala.Code 1975.[3]
Brown argues that the information she seeks does not meet the definition of a trade secret because Michelin has itself produced a video available online entitled “How Tires are Made” and because Glaz-ener acknowledged in his affidavit that he has himself conducted some public tours of the Ardmore facility in the past. However, there is no indication that the Miehelin-produced video contains footage of the Ardmore facility or the manufacturing processes, techniques, and equipment used there. Moreover, with regard to Brown’s claim that the tours conducted at the Ard-more facility undermine Michelin’s claim that the information sought constitutes trade secrets because Michelin has not *172 maintained efforts to keep that information secret from the public, see § 8-27-2(e), Ala.Code 1975, Glazener made the following statements in his affidavit:
“[Michelin] does not generally permit third persons to enter the plant unless there is a legitimate business reason. The few business guests permitted to enter the Ardmore, Oklahoma, plant must identify themselves to security personnel and state the specific purpose for their visit. The stated purpose is then verified with the [Michelin] management employee with whom the visitor is meeting before the visitor is permitted to enter. Each visitor must conspicuously wear a badge denoting his or her status and the extent of their access within the plant is limited based on business need and prior approval, with signed secrecy agreements in many instances. Each visitor is queried regarding possession of cameras and recording devices, all of which are strictly prohibited. Any items brought into the plant by a visitor may be inspected. The [Michelin] employee with whom the visitor is meeting must accompany the visitor continuously until the conference is terminated and the visitor leaves the plant. [Michelin] does not permit plant tours by persons knowledgeable about tire manufacturing who do not have a legitimate business purpose, as set forth above.
“(d) Dealers or.customers of [Michelin] who are permitted into the plant are asked to sign a confidentiality agreement. They are given ‘wide aisle’ tours, and are accompanied by [a Michelin] employee. They are not allowed to take photographs or video of the plant. A wide aisle tour allows the approved visitor to see general operations of the plant, but does not give them access to any detailed view of machine design or operation, work methods, specifications, etc. In addition, in the past we have given wide aisle tours to children on school trips, but I am not aware of any in the last fifteen (15) years.
“(e) Years ago, [Michelin] permitted persons (e.g., employee family members) who are not knowledgeable about tire manufacturing and who would not recognize or appreciate the specific confidential plant processes to enter the plant on a limited basis during shutdown periods. Cameras and other recording devices were not permitted.”
Based on the totality of the evidence concerning Michelin’s efforts to maintain security and limit access to its Ardmore facility, we do not agree with Brown’s argument that the trade-secret privilege should not apply because Michelin has not exerted “efforts that are reasonable under the circumstances to maintain its secrecy.” § 8-27-2(e).
Having concluded that Michelin has met its initial burden of showing that the information sought to be shielded from disclosure constitutes a trade secret the disclosure of which would result in injury to Michelin, we next turn to whether Brown has shown that the information sought is both necessary and relevant to the litigation. In its order granting Brown’s motion to inspect, the trial court concluded that Brown had met this burden and that it would be unjust were she not permitted to take and then use the videotape and photographs of the Ardmore facility “in the presentation of her case at trial.” In the brief filed in support of her motion to inspect, Brown also focused on her need to show the jury the videotape and photographs of the Ardmore facility, stating:
“To meet [her] burden to prove that negligent/wanton design and/or manufacturing defects in the subject tire were *173 a proximate cause of the tire’s failure, Mrs. Brown wishes to show the jury-photographs or video of representative step-by-step design, manufacturing, assembly and inspection processes of similar tires and where and/or at what stage(s) in such processes problems, mistakes or inadequacies can occur. Without such a documented on-site plant inspection, Mrs. Brown — and the jury— will be deprived of critically important information about factors which can constitute negligence/wantonness in the tire’s design, manufacture, assembly, evaluation, inspection, quality assurance, and approval for release into the marketplace. In consequence, [Brown’s] presentation of her case, and her ability to meet her burden of proof, will be significantly hampered if she is unable to adequately illustrate these facts for the jury.
“A documented inspection of the subject plant is relevant because that is the plant whose manufacturing, assembling, and quality assurance/ inspection operations are at issue. Without videos and photographs of the plant and its operations, the jurors will be left to guess about the real environment in which Michelin’s employees typically toil while manufacturing and inspecting such tires. Jurors would never know the sights, sounds, or working conditions and thereby be made to speculate about such factors in a vacuum. Without question, shortfalls and mishaps in the manufacturing process can cause poor adhesion between the various layers of a tire and can result in tread separations. Likewise, failure(s) of Michelin’s quality assurance personnel to detect manufacturing defects can result in defective tires leaving the subject plant and entering the marketplace. The jury should be permitted to see the environment in which Michelin’s employees typically perform these everyday activities.
“The jury should be allowed to learn how such conditions come to be, and there is simply no better way to create an illustration of where and how in the manufacturing process such conditions originate than a plant inspection. Plaintiffs counsel would have an opportunity to actually show the jury how design and manufacturing defects occur and are missed in the inspection process, rather than be limited to trying to explain it to the jury with charts and diagrams that are, at best, an educated guess at what the interior of the plant and the manufacturing and quality assurance processes look like.
“Photograph and videotape of the types of equipment and machinery typically used in the manufacture of the tires at the subject plant are the best available evidence of what occurs during each typical step in the tire building and inspection processes.”
It is no doubt true that videotape and photographs of Michelin’s manufacturing processes, techniques, and equipment would likely assist Brown in presenting her case to the jury. However, we do not agree that this is a sufficient basis on which to conclude that it is necessary for Brown to have access to those trade secrets. As the Supreme Court of Indiana has explained, “ ‘[necessity’ means that without discovery of the particular trade secret, the discovering party would be unable to present its case ‘to the point that an unjust result is a real, rather than a merely possible, threat.’ ” Bridgestone Americas Holding, Inc. v. Mayberry, 878 N.E.2d 189, 196 (Ind.2007) (quoting In re Bridgestone/Firestone, Inc., 106 S.W.3d 730, 733 (Tex.2003)). See also Bridgestone/Firestone, Inc. v. Superior Court, 7 Cal.App.4th 1384, 1395, 9 Cal.Rptr.2d 709, *174 715 (1992) (“[I]t is not enough that a trade secret might be useful to real parties. As we have seen, they were required to make a prima facie showing that [the desired trade secrets] in fact were relevant and necessary to their proofs.”).
Brown’s expert witness, Troy Cottles, states that he had been employed by the tire industry for 17 years and that he spent over 14 of those years “in a plant environment.” Brown has also identified a video produced by Michelin describing the tire-making process to some extent. It thus seems apparent that Brown will be able to present her case and describe and explain the tire-making process to the jury even without access to Michelin’s Ardmore facility and the trade secrets it maintains there. There is simply no basis on which to conclude that not having photographs and videotape will render Brown unable to present her case to the point that an unjust result is a real threat. Mayberry, 878 N.E.2d at 196.
However, beyond just asserting the need for photographs and videotape to be used in presenting her case, Brown also argues that an inspection will provide Cot-tles with additional support for his conclusion that the subject tire was defective inasmuch as he would have an opportunity to view Michelin’s tire-making process and to determine where and how the defect might have occurred. Thus, Brown argues, access to Michelin’s manufacturing processes, techniques, and equipment — its trade secrets — is both necessary, and relevant. Michelin argues that Brown’s claim of necessity is belied by the fact that Cot-tles, without having access to Michelin’s trade secrets, already has formulated and rendered an expert opinion that the subject tire was defective based solely on an inspection of the subject tire. Therefore, Michelin argues, Brown cannot establish that access to the Ardmore facility is truly necessary. See, e.g., Bridgestone/Firestone, Inc. v. Superior Court, 7 Cal.App.4th at 1896-97, 9 Cal.Rptr.2d at 716 (explaining that access to defendant’s trade secret would be “helpful” inasmuch as it might assist plaintiffs’ expert in determining why an observed defect occurred, but access to trade secret was nevertheless not permitted because it was not necessary for plaintiffs “to carry their burden of proof’ regarding the existence of a defect).
Moreover, Michelin argues that Brown cannot meet her burden of showing that the information she seeks is relevant because, Michelin argues, even though the subject tire was manufactured at the Ard-more facility, it was manufactured in 2004, over nine years before this discovery dispute, and the Ardmore facility no longer manufactures that tire and has in fact undergone significant changes. In his affidavit, Glazener explained the changes in the Ardmore facility since the subject tire was manufactured there:
“The manufacturing conditions that existed during the 26th week of 2004 with respect to the subject tire’s manufacturing are significantly different today and cannot be observed. In nine (9) years that have passed since the subject tire was manufactured, substantial changes have been made to the plant and its machinery.
“All (100 percent) of the tire building machines that may have been used to build the subject tire in 2004 have since been upgraded or modified. The modifications include changes to the component alignment system, the installation of new ply trays and guides, and different splice presses, among other things.
“The tire building room has also been changed by the modifications of many of the tire building machines to raise the plant’s capacity to manufacture passen *175 ger tires. These and other changes led to the reconfiguration of the tire building room equipment layout since 2004.
“The plant equipment used to fabricate and/or prepare treads, sidewalls, beads, body plies, and steel belts that would have been used in the manufacture of the subject tire in 2004 has had significant modifications. These modifications include the installation of new component cutters, numerous changes to the existing component cutters, replacement of the roll drives, reconfiguration of extruders, and the addition of new preparation machinery, among other things.
“The equipment used to cure tires like the subject tire in 2004 has been modified. These modifications include the installation of new cure presses, the replacement or rebuilding of other cure presses, the installation of new hydraulic systems, the installation of new steam headers, the replacement of insulation, and the installation of new lubrication systems, among other things.
“Other plant modifications since 2004 include the installation of a new convey- or system, the installation of new tire balance and upgraded tire uniformity optimizer machines, the installation of new modules and relocation of others, and modifications to a variety of other equipment, among other things.
“The physical plant facility has changed since 2004. For example, substantial areas of the floors have been resurfaced, new lighting installed, an upgraded cooling tower, a new addition to the east side of the production area, additional outside contractor huts built and upgraded to the exterior of the plant, among other things.”
In Morton v. Cooper Tire & Rubber Co., 288 F.R.D. 126 (N.D.Miss.2012), the United States District Court for the Northern District of Mississippi considered a motion to inspect a tire-manufacturing facility filed by a plaintiff in a case brought pursuant to the Americans with Disabilities Act, 41 U.S.C. § 121 et seq. That court ultimately granted the motion and held that the plaintiff was entitled to inspect the facility and to take photographs of the equipment the defendant manufacturer alleged the plaintiff was unable to operate because of his disability. 288 F.R.D. at 138. In its review of the relevant caselaw, the court reviewed several cases in which courts had declined to allow inspections based on the time that had elapsed since an alleged defective tire was manufactured:
“The court has paid particular attention to the cases cited by Cooper Tire in which [it] and other tire manufacturers have successfully opposed plant inspections. These eases and the rationales employed by the courts are instructive, but because each of these cases is factually dissimilar to this case, they are ultimately not helpful to ... Cooper Tire’s position.
“In some of the cases, too much time had passed from the date of injury to the date of the request. In Murphy v. Cooper Tire & Rubber Company, No. 5:08cv40 [not reported in F.Supp.2d], the federal district court in Florida rejected the plaintiffs bid to have counsel and experts inspect Cooper Tire’s Findlay, Ohio plant in a products liability, wrongful death ease. The subject tires in that action were no longer manufactured by Cooper Tire, and the plant itself had been modified such that the plant ‘does not currently reflect the manufacturing conditions and processes that existed’ when the subject tire was manufactured. Because anything discovered was ‘only marginally relevant — at best,’ and would *176 include disclosure of an entire facility, the inspection was denied. Id. at 5.
“Likewise in Daughtry v. Cooper Tire, (Circuit Court of the Fourth Judicial District of Florida, Duval County, No. 16-2006-CA-4574), the Florida state court addressed a wrongful death arising from a tire blowout. Cooper Tire manufactured the tire in 2002 and the defendant requested the inspection in 2007. The court did not order inspection [of] the Cooper Tire [facility] because of ‘significant changes since’ 2002 ‘including the use of new equipment, modifications of the physical layout and changes in the stages of the manufacturing process.’ Id. at 2. This inspection, the court found ‘would indeed expose Cooper’s trade secrets and be of modest value’ to the plaintiffs case.
“In Williams v. Daihatsu, 3-01-184-D (D.Tex. March 21, 2002) [not published], the court denied a motion in which a plaintiff sought permission for their expert to inspect any portion of a tire plant. The tire at issue had not been manufactured for five years prior to the requested inspection and ‘the production methods currently employed’ at the subject plant were ‘unlikely to replicate the production methods used when the tire in question was manufactured’ six years earlier. Id.”
288 F.R.D. at 132. See also Hajek v. Kumho Tire Co., No. 4:08CV3157 (D.Neb. Feb. 8, 2010) (not reported in F.Supp.2d) (“[A]s to plaintiffs’ request to tour or inspect Kumho’s manufacturing plant, the plant has changed since the accident tire was manufactured in 2005. There is no showing that touring and assessing the plant’s current structure, mechanisms, ventilation, or general cleanliness [in 2010] would be relevant or lead to discovering information relevant in determining why a tire manufactured in 2005 failed on August 17, 2006.”).
Thus, in these cases, courts have essentially held that plaintiffs are unable to make the relevance showing necessary to justify the inspection of a tire-manufacturing facility and concomitant disclosure of trade secrets when the tire had been manufactured as recently as five years before the discovery requests were made. In the instant case, the subject tire was manufactured over nine years before, and it is undisputed that the Ardmore facility has undergone significant change in that time. We agree with the rationales of the courts cited above, and we accordingly conclude that Brown has not established that the information she seeks by way of an inspection of the Ardmore facility is necessary and relevant to this litigation. For this reason, the trial court exceeded its discretion when it granted Brown’s motion for an on-site inspection of Michelin’s Ard-more facility, and the trial court is hereby directed to vacate its August 5, 2013, order granting that motion.
IV.
We next consider Michelin’s petition in case no. 1121341 challenging the trial court’s order requiring it to produce complete responses to Brown’s 10 outstanding interrogatories and 22 outstanding requests for production. Michelin does not challenge the entire scope of the trial court’s order, instead focusing its objections on 3 interrogatories and 12 requests for production. Michelin argues that it should not be compelled to respond to these discovery requests for three reasons: (1) the requests, it says, are too broad inasmuch as they seek the disclosure of information that Michelin alleges is not relevant; (2) the requests, its says, seek the disclosure of protected trade secrets and, Michelin alleges, Brown has not established that those trade secrets are rele *177 vant or necessary to her case; and (3) responding to these requests would impose a burden upon Michelin that Michelin alleges is excessive and impermissible.
Before considering the merits of these individual arguments, we first consider Brown’s argument that Michelin’s excessive-burden argument is not properly before this Court. Brown made her initial discovery requests in November 2011, and, after she and Michelin were unable to resolve Michelin’s objections regarding those requests, Brown, in March 2013, moved the trial court to compel Michelin to respond to her requests. Thereafter, the parties filed multiple briefs with the trial court regarding Brown’s motion to compel, and the trial court held two separate hearings — on April 26, 2013, and July 10, 2013 — to specifically discuss the proper scope of discovery. Michelin’s filings during this time included two affidavits from its expert Slagh detailing its objections to Brown’s discovery requests. Those affidavits and Michelin’s arguments during this time frame were exclusively devoted to Michelin’s claims that the discovery requests were too broad and sought the disclosure of protected trade secrets — Michelin did not argue that responding to the requests would impose an excessive and undue burden upon it. On August 5, 2013, the trial court granted Brown’s motion to compel, and it was not until August 14, 2013, when Michelin moved the trial court to reconsider and to enter a protective order in Michelin’s favor that Michelin first asserted an excessive-burden argument, supported by a third affidavit sworn by Slagh. Brown then moved the trial court to strike that affidavit, and, on August 16, 2013, the trial court did so, stating:
“Michelin had every opportunity to present evidence for this Court’s consideration prior to and during the two hearings conducted on these motions. Furthermore, Michelin’s counsel requested and was given an opportunity to work on a compromise with [Brown’s] counsel concerning the proposed scope of discovery, but according to the record, elected not to have any communication with [Brown’s] counsel despite being provided with the opportunity to do so. The court accordingly concludes that Mr. Slagh’s August 14, 2013, affidavit comes far too late and shall not now be considered.”
Michelin now reasserts its excessive-burden argument to this Court and argues that the trial court improperly struck Slagh’s third affidavit. Brown meanwhile has moved this Court to strike Slagh’s third affidavit from the materials before us and further argues that we should strike Michelin’s entire petition in case no. 1121341 because, she says, it relies heavily on that affidavit. Although we deny the motion to strike Michelin’s petition, we agree that the trial court acted within its discretion in striking Slagh’s third affidavit. Accordingly, because that affidavit was not considered by the trial court, we give it no consideration in deciding the merits of Michelin’s petition for the writ of mandamus. See Ex parte Verbena United Methodist Church, 963 So.2d 395, 399 (Ala.2006) (“We have not relied upon [plaintiffs] affidavit because, as previously stated, when this Court considers a mandamus petition, we can review only the evidence that was before the trial court.”).
Michelin argues that Slagh’s third affidavit was proper and timely because, it argues, under this Court’s decision in Ex parte Reynolds Metals Co., 710 So.2d 897 (Ala.1998), it was required to file a motion for a protective order after the trial court granted Brown’s motion to compel before it could petition this Court for mandamus relief. See Ex parte Horton Homes, Inc., *178 774 So.2d 586, 540 (Ala.2000) (“Simply put, Reynolds Metals stands for the proposition that a party dissatisfied with the trial court’s ruling on a motion to compel discovery must first make a timely motion for a protective order, so as to create a record to support the essential allegation that the petitioner has no other adequate remedy. Id. The motion for a protective order pursuant to Rule 26(c)[, Ala. R. Civ. P.,] and any subsequent mandamus petition must be filed within the time period set for production by the trial court in its order compelling discovery.”). Moreover, Michelin argues, courts regularly consider new evidence submitted in support of a motion for a protective order even after the order compelling discovery is entered. See, e.g., Ex parte Loube Consulting Int’l, Inc., 45 So.3d 741 (Ala.2010), Ex parte Fairfield Nursing & Rehab. Ctr., L.L.C., 22 So.3d 445 (Ala.2009), and Ex parte Orkin, Inc., 960 So.2d 635, 640 (Ala.2006).
However, the fact that courts sometimes consider new evidence submitted in support of a motion for a protective order filed after an order compelling discovery. has been entered does not mean that all courts are always required to do so. “This Court has repeatedly recognized that a trial court has broad and considerable discretion in controlling the discovery process.” Pensacola Motor Sales, Inc. v. Daphne Auto., LLC, 155 So.3d.930, 941 (Ala.2013). In this case, the parties have quibbled about the scope of discovery for over two years. The trial court has held two hearings specifically to address the issue of Michelin’s objections to Brown’s discovery requests. At those hearings, the trial court repeatedly expressed its frustration with the slow pace of the case, the time the case was requiring, and even the parties’ propensity to file motions and evi-dentiary filings in an untimely fashion. In no filings leading up to those hearings or at the hearings themselves did Michelin make a cogent argument that the discovery requests would impose an undue and excessive burden upon it. Only after the trial court had entered its ruling granting Brown’s motion to compel — following five months of discussion and multiple hearings on that specific issue — did Michelin assert an excessive-burden argument for the first time. In light of that delay, we cannot say that the trial court exceeded its discretion in declining to consider Michelin’s belated argument, and Slagh’s affidavit supporting it, on the basis that they came “far too late.”
We emphasize, however, that this is not to say that courts have no discretion to consider new evidence submitted in accordance with a motion seeking a protective order following an order compelling discovery. Certainly, if the order compelling discovery has been entered in a perfunctory manner, it would be entirely appropriate to do so. However, in this case, the trial court expended a great deal of time, effort, and oversight over the course of a five-month period attempting to resolve the parties’ dispute regarding the scope of discovery. After granting the parties ample time and opportunity to submit evidence and make arguments in support of their respective positions, it entered an order compelling the discovery requested. Only then did Michelin assert for the first time that Brown’s discovery requests would impose an undue and excessive burden upon it. Based on these circumstances, we hold that the trial court acted ■within its discretion when it struck the affidavit filed to support this new and belated argument. To rule otherwise would allow Michelin to effectively negate five months of proceedings on Brown’s motion to compel.
We must still, however, consider the two arguments that are properly be *179 fore us in case no. 1121341 — whether the trial court’s order compelling discovery is too broad and whether it requires Michelin to disclose protected trade secrets. In its petition, Michelin summarizes the compelled discovery as follows:
“Under the order, the temporal scope of which exceeds a decade, [Michelin] is required to produce the following design, manufacturing and test-related documents (many of which are protected trade secrets) in response to Interrogatory No. 11 and Document Request Nos. 5, 8,11, 24, 29, 30 and 31:
“A copy of all specifications and changes to the specifications relating to the approximately 2,600 tire designs and 375 million tires encompassed by the defined discovery scope (Interrog. No. 11; Doc. Request No. 5);
“All economic analyses regarding the cost implementation of any such design changes (Doc. Request No. 11);
“All tests or test studies conducted by any entity relating to the tires encompassed by the defined discovery scope (Doc. Request No. 8);
“[Miehelin’s] Decision Trees and Aspect Specifications (Doc. Request Nos. 29, 30, and 32); and
“Any internal memos, notes, reports or studies relating to tread separations, tread/belt separations, or belt edge separations, for any tires encompassed by the defined discovery scope (Doc. Request No. 24).
“Further, with respect to Interrogatory No. 14, and Document Request Nos. 9, 18 and 23, [Michelin] is required to produce ‘documents of any type whatsoever’ relating to claims, complaints and lawsuits asserted against [Michelin] regarding all tires encompassed within the defined discovery scope, as well as adjustment data reflecting warranty returns, regardless of the type of tire failure involved. The court also ordered the production of ‘all documents and/or writings’ relating to any product liability claims involving tread separations in all tires within the defined discovery scope (Document Request No. 10) and ‘all incident reports, claims reports or product liability reports’ reflecting any such complaints (Document Request No. 26).”
(Michelin’s petition, pp. 7-8.)[4]
The parties’ dispute regarding the breadth of discovery basically centers on what tires are relevant to Brown’s claim. Michelin takes the position that Brown is entitled only to discovery related to P265/70R15 110S B.F. Goodrich Radial Long Trail T/A passenger tires manufactured at the Ardmore facility from 2002-2006, approximately two years before and two years after the subject tire was manufactured. In support of this argument, Michelin cites Slagh’s affidavits, in which he acknowledges that “[m]ost modern automotive tires share some basic features” but states that the various models of tires that Michelin produces are otherwise so different in terms of “size, load capacity, components, compounds, number of plies, recommend pressures, speed ratings, and intended applications” that they cannot be considered to be substantially similar to the subject tire and are therefore of no relevance to the instant case. Slagh further states that P265/70R15 110S B.F. Goodrich Radial Long Trail T/A passenger tires like the subject tire were manufactured only at the Ardmore facility and that even a tire manufactured and marketed *180 under that name in 2002 is a fundamentally different design from a tire manufactured just two years later.
Brown’s expert Cottles, however, responded to this argument in his affidavit, stating that “Michelin’s position limiting the scope of time and scope of tires subject to discovery is highly evasive because it allows Michelin to conceal a substantial amount of highly relevant evidence relating to design and manufacturing defects at issue in the subject tire.” Cottles further states:
“I have personally inspected dozens of Michelin tires, including x-rays, and shearographic examinations. The Michelin tires I have inspected and x-rayed include 14", 15", 16", and 17" tires in widths ranging from 185 millimeters to 275 millimeters and speed ratings of 130 and below. Based on my many Michelin tire inspections, I conclude that •all tires of sizes 14", 15", 16", and 17" of a width of 185-275 millimeters, with a speed rating of 130 mph or below, contain the same basic tire structure which includes a tread, a tread base, two steel' belts where the steel wires are encased in a compounded rubber and an inner liner. In addition, there are other components that are common to all Michelin tires such as sidewalls, veneers, rim cushions, chafers, bead and filler. The subject tire is no different.
[[Image here]]
“Michelin’s Long Trail tire line is composed of various' substantially similar tires that share common design characteristics and materials. The size differences are meaningless.
[[Image here]]
“The tire brand or tire line is completely irrelevant. Michelin makes many brands or lines of tires and I can say with a high degree of confidence that the brand or line is nothing more than a marketing tool. As many as 20 brands or lines of tires may be made to a single green tire specification or GTS.
“Michelin, as do all other tire manufacturers, streamline the design and manufacture process by building up known design and manufacture processes. In real world terms, the wheel is not reinvented every time Michelin places a new product into the market. It is for this reason the same skim stock and virtually all components are interchangeable, without consideration to size, between the various Michelin tire lines, makes and models.
“The typical failure mode in Michelin tires I have forensieally examined, regardless of size, plant of manufacture or date of manufacture, is essentially the same — belt-leaving-belt separation. The belt-leaving-belt separations that I have seen in Michelin tires begin as belt edge separation at the edge of the second, or top, belt. Significantly, they generally occur after several years of operation.
“Moreover, the same design and/or manufacturing defects which caused the tread separation failure in the previous Michelin cases I have been involved with are similar to the design and/or manufacturing defects in the case at hand. The defects, which are thoroughly discussed in the information [Brown] now seek[s] to compel production of, concern the catastrophic failure of Michelin tires as the result of belt to belt separation. Hence, the modes and mechanisms of failures are the same.
“Regardless of tire size, plant of manufacture, or date of manufacture, the Michelin tires that failed in other cases are similarly designed and share similar design and manufacturing defects to the defects I have identified in this case. In prior cases, the Michelin tires were designed with no nylon caps to retard belt/ *181 belt detachment. The failure to use a nylon cap was among the design defects that I found in this case. Michelin knew of these defects long before the manufacture of the subject tire.
“At any given point in time, the belt skim rubber used in Michelin light truck and passenger tires, regardless of size, plant of manufacture, or date of manufacture, is identical.
“It is common knowledge in the tire industry that tire defects often become more prevalent after tires have been in service for several years. Tread separation of the type exhibited by the subject tire is due, in part, to accelerated deterioration of the physical properties of the tire’s internal compounds. This deterioration may be accelerated by poor for-mulae, poor design specifications, or poor execution in manufacturing and formulation. A shortcoming in any of these materials or procedures will be exhibited in all sizes that use the same material and manufacturing process. All of these similar tires have the same ‘separation resistance.’ Thus, the information relating to other similar Michelin tires is highly relevant to evaluating the defects in the subject tire.”
Thus, the trial court was essentially tasked with making a discovery determination in the face of contradictory expert affidavits — Michelin’s expert stated. that only information related to P265/70R15 110S B.F. Goodrich Radial Long Trail T/A passenger tires was relevant to Brown’s claims, while Brown’s expert stated that information related to almost any Miehe-lin-produced tires within a 10-year time span was relevant and discoverable. Toward the end of the July 10 hearing on this issue, the trial court noted the difficulty in bridging the gap between these two positions and stated that without having some standard by which to reasonably narrow the scope of discovery it was inclined to accept the broad scope proposed by Brown. Counsel for Michelin offered to help the court find a compromise position, stating:
“ATTY: The proposal is — you know, the dilemma, I guess, we have is Michelin has staked out this position. [Brown] ha[s] staked out this position and no one has really staked out anything in the middle, which is—
“COURT: I’m trying to give you the opportunity.
“ATTY: Yeah. Well, I know I offered one thing and I think some other things in discussion were offered by way of compromised scopes. I wonder if it would be useful to the court if, within the ten days we’re supposed to submit information on the plant inspection order, we should submit our very best compromise position between those two extremes to the court for consideration, if that would be of any benefit to the court. We can go back and search ourselves and say how far can we stretch, what can we do, and just offer that to the court.”
The trial court welcomed Michelin to submit such a compromise; however, Michelin failed to follow up on its offer, and the offered materials were never submitted to the trial court. Accordingly, the trial court entered a ruling based on the arguments that were made and the evidence that was before it. As noted, much of that evidence appears to be incompatible; in such instances the decision is left to the discretion of the trial court. Based on the record before us, we cannot say that the trial court exceeded its discretion in defining the scope of discovery as it did.
Michelin also argues that the trial court exceeded its discretion by compelling the production of protected trade secrets. Michelin specifically objects to the produc *182 tion of information related to its quality-assurance processes, including adjustment data for returns and “decision trees or aspect specifications,” which describe the process by which tires are inspected after manufacture. We discussed the burden-shifting process and balancing analysis a trial court must conduct when considering such an argument in our discussion of case no. 1121330. We generally agree with the implicit conclusion of the trial court that Brown’s need for the requested information outweighs any harm that would result to Michelin from its disclosure, especially in light of the protective order that was previously entered in this case. However, to the extent the order entered by the trial court requires Michelin to produce information concerning any instance of tire failure, we agree with Michelin that such discovery is unwarranted.
In Ex parte Cooper Tire & Rubber Co., 987 So.2d 1090 (Ala.2007), this Court reviewed a discovery order entered in another case in which it was alleged that a tire failure had resulted in an automobile accident resulting in fatalities. Although we upheld the vast majority of the order entered by the trial court, we nevertheless held that Cooper Tire was entitled to an order prohibiting discovery of any materials that did not relate to the failure of Cooper tires as a result of tread separation, stating:
“Under the standard articulated in [Ex parte ] Weaver, [781 So.2d 944 (Ala.2000) ], documentation concerning tire failures that occurred for reasons unrelated to tread separation [is] not properly included in the discovery of materials directed toward the plaintiffs’ claims that Cooper’s defective design and manufacture caused the tread separation that resulted in the accident here. The trial court should restrict the discovery sought by the plaintiffs to material related to the failure of Cooper tires as a result of tread separation.”
987 So.2d at 1104. In the instant case, it is likewise alleged that the automobile accident at the center of the case was the result of tread separation. Accordingly, for the reasons set forth in Ex parte Cooper Tire, we hold that Michelin is protected from being required to disclose information, including data for returns and warranty claims, concerning defects or tire failure not related to tread separation. As we stated in Ex parte Cooper Tire: “[W]e defer to the trial court’s management of the discovery process as to all other aspects of its order[ ] to compel production, and we conclude that in entering th[at] order[] the trial court did not exceed its discretion.” 987 So.2d at 1109.
V.
Michelin petitioned this Court for writs of mandamus directing the trial court to vacate its order allowing Brown to inspect Michelin’s Ardmore tire-manufacturing facility (case no. 1121330) and to vacate its order compelling Michelin to answer certain interrogatories and to comply with certain document requests propounded by Brown (case no. 1121341). For the reasons explained in this opinion, we grant Michelin’s petition in case no. 1121330 and direct the trial court to vacate its order requiring Michelin to allow Brown to- inspect its Ardmore facility. We grant Michelin’s petition in part in case no. 1121341 and direct the trial court to modify its order compelling discovery to exclude the production of any materials that do not relate to the failure of Michelin tires as a result of tread separation; in all other respects, the petition is denied.
1121330 — PETITION GRANTED; WRIT ISSUED.
BOLIN, PARKER, WISE, and BRYAN, JJ., concur.
*183 MURDOCK, J., concurs in the result.
MOORE, C.J., and MAIN, J., dissent.
1121341 — PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
BOLIN, PARKER, MURDOCK, WISE, and BRYAN, JJ., concur.
MOORE, C.J., and MAIN, J., concur in part and dissent in part.

. The trial court had already conducted a previous hearing on April 26, 2013, to hear arguments on Brown’s discovery motions.

. The Rubber Manufacturers Association, the Product Liability Advisory Council, and the *170 Business Council of Alabama have also filed amici curiae briefs in support of Michelin in case no. 1121330.

. Section 8-27-2(1), Ala.Code 1975, defines a trade secret as information that:
"a. Is used or intended for use in a trade or business;
"b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;
“c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
"d. Cannot be readily ascertained or derived from publicly available information;
“e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and
"f. Has significant economic value.”

. Michelin did not, in this excerpt from its petition, cite the third interrogatory it challenges, interrogatory no. 18; however, its objection to that interrogatory similarly relates to the breadth of the request.